**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **DONNA M. GOFFRON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Case No. 11 C 2114** |
| **v.** ) | |
| ) | **Magistrate Judge Morton Denlow** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Claimant Donna M. Goffron ("Plaintiff" or "Claimant") brings this action under 42 U.S.C. § 405(g), seeking reversal or remand of the decision by Defendant Michael J. Astrue, Commissioner of Social Security ("Defendant" or "Commissioner"), denying Claimant's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI) by finding Claimant not disabled. Claimant raises the following issues in support of her motion: (1) whether the Administrative Law Judge ("ALJ") improperly relied on the Commissioner's Grid to deny disability despite the fact that Claimant's impairments result in significant nonexertional limitations; and (2) whether the ALJ's credibility determination was erroneous. For the following reasons, the Court denies Claimant's complaint for judicial review seeing to reverse or remand the decision of the Commissioner and grants the Commissioner's motion to affirm the Commissioner's decision.

## I. BACKGROUND FACTS

**A.     Procedural History**

Claimant filed for DIB and SSI on August 30, 2007.  R. 108-17.[1]  Claimant alleged

a disability onset date of April 6, 2007. R. 108, 114.  The Social Security Administration

("SSA") denied her applications on November 19, 2007.  R. 59-63.  Claimant filed a request

for reconsideration on January 7, 2008, which was denied by the SSA on February 21, 2008.

R. 64-65, 66-73.  Shortly thereafter, Claimant requested a hearing before an ALJ.  R. 74-75.

On August 5, 2009, Administrative Law Judge James A. Horn ("ALJ") presided over

a hearing at which Claimant appeared with her attorney, Jonathan Pearson.  R. 26.  Claimant

testified at the hearing.  R. 31-44.  Claimant's husband, Lloyd Lehman, also testified.  R. 44-

51.  Significantly, no testimony was taken from a Vocational Expert.

On November 3, 2009, the ALJ issued a decision finding Claimant not disabled from

April 6, 2007 through the date of his decision. R. 12-25.  Specifically, the ALJ found that

"Claimant retains the ability to perform the full range of all exertional activities along with

the ability to understand, remember, and carry out instructions, respond appropriately to

supervision, and co-workers, and respond appropriately to work pressures in a work setting"

but must avoid working around moving machinery or at unprotected heights.  R. 19.

Claimant then filed for review of the ALJ's decision to the Appeals Council on

December 7, 2009.  R. 10-11.  On January 24, 2011, the Appeals Council denied the request

---

[1]Claimant initially filed an application for DIB and SSI on May 21, 2004.  R. 119.  That
application was denied initially and at the reconsideration level; Claimant did not appeal that
denial.  *Id.*

for review, making the ALJ's decision the final decision of the Commissioner. R. 1-3. Claimant subsequently filed this action for review pursuant to 42 U.S.C. § 405(g). Oral argument before this Court was held on April 10, 2012.

**B. Hearing Testimony – August 5, 2009**

**1. Donna M. Goffron – Claimant**

At the time of the hearing, Claimant was fifty-four years old. R. 32-33. She lives with her husband, Lloyd Lehman. R. 33. Claimant testified that she graduated from college with a 4.0 grade point average in accounting. *Id.* Claimant was employed as an executive assistant at BP Castrol for twenty-five years, which ended on September 13, 2002, when her position was eliminated. R. 36. After her position was eliminated at BP Castrol, Claimant worked at Elford Wolfe as an executive assistant from April 21, 2006, through the end of November 2006. R. 35-36. Claimant's most recent permanent employment was for six weeks at Toys "R" Us which ended in October 2007 when she quit due to stress. R. 33. She attempted to work at a bakery after quitting the job at Toys "R" Us, but only held that job for one day because her arthritis prevented her from accomplishing assigned tasks. R. 33-34. Additionally, Claimant held various positions via a temporary work agency through April 2007 and worked as a telemarketer in 2008. R. 34-35, 177. At the time of the hearing, the only identified source of income for Claimant's household was her husband's Social Security benefits. R. 32.

Claimant experienced her first grand mal seizure in October 2002. R. 37. Claimant testified that the seizure condition went untreated for a couple of years, other than emergency

room visits, until she began to see doctors at Stroger Hospital. *Id.* The seizures were then under control with medication. *Id.* Claimant testified that she had a minor seizure in the summer of 2008. *Id.* At her doctor's recommendation, Claimant altered her medication regiment. *Id.* Claimant testified that between the summer of 2008 and the time of the hearing (summer 2009) she had one small seizure but did not receive any treatment. R. 38. Claimant's last grand mal seizure was in May of 2007. *Id.* Claimant described the seizures that she has suffered since May of 2007 as "very minor." R. 37.

When asked by the ALJ why she felt she could not work, Claimant stated that she is not motivated and is a "shell of the person" she once was. R. 40. Additionally, Claimant said she would be unable to perform work because she cannot handle being under stress. R. 41. Her medication causes fatigue such that she has to nap; her life revolves around her medication pattern. *Id.* Claimant testified that she is unable to drive as a result of the seizure condition, but at the time of the hearing, she held a valid driver's license with only eye restrictions. R. 38-40.

Claimant's medications at the time of the hearing included Geodon, for her bipolar disorder, and Depakote, for both her bipolar disorder and the seizures. R. 41. She also stated that she takes Ibuprofen for her arthritis as needed, and sometimes takes Trazodone for sleeping. R. 41.

Claimant stated that the last time she drank alcohol was five years ago. R. 42. Claimant testified that it is difficult for her to take a shower on a daily basis. *Id.* Other than visiting her ninety-one year old mother once or twice per week, her only social activity is

spending time with a girlfriend a couple of times each month. *Id.* Claimant said that she used to have many friends, but most have "gone to the wayside." *Id.* Claimant stated that she would not be able to get herself up every morning and get into a routine if she had to go to work each day. R. 43. There are zero days out of a week in which she is symptom free. *Id.* Claimant testified that she is at an "even keel" and her medication prevents her from getting excited over things. *Id.* She is less ambitious than she used to be, which she also attributes to her bipolar medication. R. 40-41.

### 2. Lloyd Lehman - Claimant's Husband

Lloyd Lehman ("Mr. Lehman"), Claimant's husband, was questioned by Claimant's attorney and the ALJ. R. 44-49. Mr. Lehman stated that he did not believe Claimant could be self-sufficient in any capacity. R. 44. He testified that it would not be safe for her to travel any distance on her own because she does not remember anything when she has a seizure. R. 44-45. He further testified that without his assistance, Claimant would not be likely to take her medications on her own. R. 47. Mr. Lehman also explained that Claimant does not have any "good days" but, rather, her medicine keeps her in the "middle" without any exciting moments. *Id.* He does not believe her memory is good enough to remember one or two simple instructions. *Id.* He stated that Claimant would not be able to perform tasks assigned to her in a job setting. R. 49.

Mr. Lehman stated that he noticed that his wife's condition improved when she stopped using alcohol five years ago, particularly regarding basic living responsibilities. R. 49-50.

**C.      Medical Evidence**

**1. Pre-Onset Date**

**a. Gottlieb Memorial Hospital – October 2002 through December 2002**

Claimant was taken to the Gottlieb Memorial Hospital emergency room on October 6, 2002 for evaluation of a new onset seizure disorder and was discharged on October 9, 2002.  R. 321.  Dr. Haresh B. Sawlani, M.D. ("Dr. Sawlani") evaluated Claimant.  *Id.*  Upon discharge, Claimant was diagnosed with: seizure disorder, alcohol dependence, alcoholic hepatitis, alcohol withdrawal seizures, duodenal ulcer, hiatal hernia, iron deficiency anemia, and depression.  *Id.*  Claimant was prescribed Depakote.  R. 322.

During that hospital stay, Claimant had a consultation with Anshuman Chawla, M.D. ("Dr. Chawla") on October 7, 2002 for anemia and alcohol abuse. R. 330. Dr. Chawla's impressions of the consultation resulted in the following conclusions: macrocytic anemia, history of alcohol abuse, new onset seizure disorder, black stool, and elevated parate aminotransferase (AST). R. 330.

Claimant also had a consultation with Erik Sinka, D.O. ("Dr. Sinka") on October 7, 2002 regarding her new onset seizure disorder.  R. 334.  Dr. Sinka concluded that Claimant had several episodes of witnessed generalized convulsions on October 6, 2002. R. 335. Dr. Sinka also indicated that he was unsure as to the relation of alcohol use or cessation with regard to the seizures but believed alcohol consumption may have played a part. R. 335.

In a follow-up consultation with Claimant on December 10, 2002, Alan Daar, M.D. ("Dr. Daar") performed a CT scan which indicated no significant changes from the CT scan performed on October 6, 2002. R. 356.

Claimant was re-admitted to Gottlieb Memorial Hospital on December 18, 2002. R. 323. Claimant received treatment at Oak Park Hospital emergency room and was then transferred to Gottlieb at Dr. Sawlani's request. R. 323. On December 18, 2002, Dr. Sawlani noted noncompliance with Claimant's medication as Claimant reported missing doses of her medications or taking her medications secondary to alcohol abuse. R. 324. On December 19, 2002, Madhu Soni, M.D. ("Dr. Soni") evaluated Claimant based on confusion and seizures. R. 325. Dr. Sawlani noted that Claimant's seizures appeared to be due to alcohol withdrawal and recommended that Claimant avoid working at tall heights or around heavy machinery. R. 327.

The following day an MRI was performed at Dr. Soni's request. R. 354. Atrophy and some ventricular dilation were present, which was inconsistent with Claimant's stated age, but these conditions were stable when compared to prior exams. *Id.* There were no other abnormal findings. *Id.*

### b. Rush Oak Park Hospital – December 2002 through August 2005

Claimant presented to the Rush Oak Park Hospital emergency room on December 14, 2002, with confusion and was discharged a few hours later following treatment. R. 276. Claimant again presented to the Rush Oak Park Hospital emergency room on December 18, 2002 with a seizure. R. 281.

Claimant was admitted to the Rush Oak Park Hospital after presenting at the emergency room on January 2, 2003, because she was confused and unresponsive. R. 264. Dr. John V. Courtney's conclusion was atrophy in the frontal lobes following a CT. R. 273.

Claimant was again taken to the Rush Oak Park Hospital emergency room on January 11, 2003 due to a seizure. R. 258. Claimant was treated at the hospital and released approximately two hours later in good condition. R. 258.

Claimant presented to the Rush Oak Park Hospital emergency room on January 25, 2003, with acute alcohol intoxication and a head laceration, apparently from a fall. R. 413. Claimant was seen and evaluated by the emergency room physician, treated, and subsequently admitted to the hospital for further evaluation and treatment. R. 385. A CT and other testing did not indicate any noted abnormalities. *Id.* Claimant was not experiencing withdrawal seizures but was evaluated by social services for an outpatient alcohol rehabilitation program. *Id.* Claimant was discharged on January 30, 2003, in stable condition with a diagnosis of alcohol withdrawal, seizure disorder, alcohol intoxication, and a head laceration. R. 413.

On February 6, 2004, Claimant was admitted to the Oak Park emergency room due to a seizure. R. 245. The diagnosis included alcoholism and withdrawal seizures. R. 245. Claimant was admitted to the hospital on February 7, 2004 and discharged on February 8, 2004. R. 251.

Two days later, Claimant was again taken to the Rush Oak Park Hospital emergency room and then admitted for observation on February 10, 2004, after her husband called an

ambulance because Claimant was confused and disoriented. R. 239. Claimant's diagnosis included seizure disorder and alcoholism withdrawal seizures. R. 239. Claimant also presented at the Oak Park Hospital in February 21, 2004, and May, 12, 2004, for left ankle pain and a twisted ankle, respectively. R. 233, 237.

Blood tests in February 2004 and August 2005 indicate potential diabetes. R. 387-88. A CT of the head was performed on August 31, 2005; the conclusion was redemonstration of atrophic changes and noted that the "distribution can be seen with alcohol substance abuse." R. 403.

### c. Northwestern Memorial Hospital – January 10, 2003

Claimant was taken to the Northwestern Memorial Hospital emergency room on January 10, 2003 and a CT scan was performed. R. 369-83. Claimant's ventricles and sulci were found to be mildly more prominent than one would expect for someone of forty-seven years of age—Claimant's age at the time of the CT scan. R. 369. No other abnormalities were noted. *Id.*

### d. Good Samaritan Hospital – May 18, 2004 to May 19, 2004

Claimant presented to the Good Samaritan Hospital emergency room on May 18, 2004 with breakthrough tonic clonic seizures associated with urinary incontinence. R. 422. Claimant's Depakote dosage was increased, prescriptions for bipolar disorder were continued, and she was given thiamine and folic acid for her history of alcohol. R. 432. A CT showed a prominent ventricular system, which was most likely due to atrophy. R. 438.

An MRI showed that Claimant's sulci and ventricles were larger than expected—compatible with atrophy—and which also showed increased meningeal enhancement. R. 436-37.

### e. Cook County Hospital – August 2004 through September 2004

Laboratory reports, outpatient progress notes, and physician consultation notes from Cook County Hospital from August 13, 2004 to September 24, 2004 indicate Claimant suffers from epilepsy and a seizure disorder that was poorly controlled at the time. R. 291-95.

### f. John F. Conran, M.D. – State Agency Physician

Dr. John F. Conran ("Dr. Conran"), a state agency doctor, reviewed all reports sent by the Bureau of Disability Determination Services, met with Claimant for forty-five minutes, and prepared a psychiatric evaluation of Claimant on September 7, 2004. R. 286-89. Dr. Conran noted that Claimant had a history of seizures and reported a background of manic type behavior. R. 289. He also noted that she had a somewhat limited range of social activities, but was still active even though she felt depressed. R. 289. Dr. Conran diagnosed Claimant with bipolar disorder and a history of seizures. R. 289.

### g. Robert Patey, M.D. – State Agency Reviewing Physician

Dr. Robert Patey ("Dr. Patey") completed a physical residual functional capacity ("RFC") assessment of Claimant on November 5, 2004. R. 296. Dr. Patey found that Claimant had the ability to occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push

and/or pull in an unlimited manner. R. 297. Dr. Patey listed no postural limitations, no manipulative limitations, no visual limitations, and no communicative limitations. R. 298-300. Dr. Patey noted Claimant should avoid concentrated exposure to hazards, including machinery and heights. R. 300. Dr. Frank Jiminez, M.D., reviewed all of the medical evidence in Claimant's file on March 4, 2005 and affirmed Dr. Patey's November 5, 2004 assessment. R. 318.

### h. Erika Altman, Ph.D. – State Agency Reviewing Physician

Erika Altman, Ph.D. ("Dr. Altman") completed a psychiatric review of Claimant on November 11, 2004. R. 304-17. Dr. Altman found that Claimant had non-severe impairments, based on an affective disorder, namely bipolar. R. 304, 307. Dr. Altman then concluded that Claimant had mild limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace; Dr. Altman found no episodes of decompensation. R. 314. Dr. Altman noted that Claimant's memory was within normal limits and she had an adequate fund of knowledge, good concentration, and possessed good judgment. R. 316. John Tomassetti, Ph.D. ("Dr. Tomassetti") reviewed all of the medical evidence in Claimant's file on March 4, 2005 and affirmed Dr. Altman's November 11, 2004 assessment. R. 319.

### 2. Post-Onset Date

### a. Ana A. Gil, M.D. – State Agency Psychiatrist

Ana A. Gil, M.D. ("Dr. Gil") performed a psychiatric examination of Claimant for the Social Security Administration on October 17, 2007. R. 467. Dr. Gil diagnosed Claimant

with bipolar disorder, moderately severe depression, a past history of chronic alcohol dependence and abuse for twenty years which at the time was in remission for three and a half years, and a history of a seizure disorder. R. 470. Dr. Gil opined that "if the Claimant were awarded funds she would not be able to handle them herself." *Id.*

### b. Terry Travis, M.D. - State Agency Reviewing Psychiatrist

Terry Travis, M.D. ("Dr. Travis") completed a Mental RFC Assessment on November 9, 2007 after reviewing the evidence of record, including Dr. Gil's evaluation. R. 471-88. Dr. Travis diagnosed bipolar disorder and noted moderate limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. R. 481. In his summary conclusions, Dr. Travis determined that Claimant is not significantly limited in performing activities within a schedule and maintaining regular attendance and punctuality, but has moderate limitations on maintaining attention and concentration for extended periods of time. R. 485. He also noted moderate limitations on her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number of rest periods. R 486. Dr. Travis summarized his functional capacity assessment by concluding that Claimant had symptoms of bipolar disorder and that her mental status was essentially normal except for appearing sad. R. 487. Dr. Travis opined that Claimant related appropriately and was able to adapt to circumstances, learn instructions, could function consistently at a reasonable rate within a schedule, and was able to do multistep tasks that can be learned within one to six months in a routine work setting. *Id.*

### c. Vidya Madala, M.D. – State Agency Reviewing Physician

Vidya Madala, M.D. ("Dr. Madala") completed a physical RFC assessment on November 14, 2007. R. 489-96. Dr. Madala diagnosed Claimant with seizure disorder. R. 489. Dr. Madala opined that Claimant should only occasionally climb ladders, ropes, or scaffolds and she should avoid concentrated exposure to hazards such as machinery and heights. R. 491-93. Dr. Madala noted that Claimant's seizures were controlled as she has not had a seizure in the past three years. R. 496.

### d. Bharati Jhaveri, M.D. – State Agency Reviewing Physician

Bharati Jhaveri, M.D. ("Dr. Jhaveri") reviewed all the evidence in the file and affirmed both Dr. Madala's physical RFC assessment and Dr. Travis's mental RFC assessment on February 12, 2008. R. 498. Explaining his decision, Dr. Jhaveri opined that Claimant's seizure disorder was well controlled, as she had not had one in three years. R. 499. Dr. Jhaveri opined that Claimant was capable of performing semi-skilled work but should not be required to work around hazardous machinery or unprotected weights. R. 499.

### e. Oak Forest Hospital – August 22, 2008

Claimant was taken to the Oak Park Hospital emergency room on August 22, 2008 after falling at home and hearing a cracking in her left foot. R. 789. While in the emergency room waiting room, Claimant's husband and an emergency room nurse noticed some minimal upper extremity seizure activity. *Id.*

13

**f. Stroger Hospital - May 03, 2007 through April 8, 2009**

Claimant was given a psychological evaluation at Stroger Hospital on May 3, 2007. R. 806. Claimant expressed feeling "good"despite recently losing her job. *Id.* The physician noted depressed mood, worthlessness, hopelessness, sleep and appetite disturbance. *Id.* Claimant denied excessive worrying or panic symptoms. *Id.*

Claimant presented for medication refill at Stroger Hospital on November 15, 2007; the notes reflect her bipolar diagnosis. R. 805. Claimant stated that her mood had been worse lately and that motivation was difficult. *Id.* On April 15, 2008, Claimant reported that she was doing well on her current medication and denied feeling depressed. R. 802. However, on October 15, 2008, Claimant again complained of depression, poor concentration, lack of motivation, poor personal hygiene, poor sleeping habits and excessive daytime fatigue. R. 800. Claimant also stated she had more manic episodes during the summer. *Id.* December 3, 2008 treatment notes indicate that Claimant's mood had improved. R. 799. Finally, on December 21, 2008, a physician at Stroger noted Claimant was doing well on her current medication. R. 807-08.

**D.     The ALJ's Decision– November 3, 2009**

Following a hearing and review of the medical evidence, the ALJ rendered a decision unfavorable to Claimant on November 3, 2009. R. 15-25. The ALJ found that Claimant was not under a disability, as defined in the Social Security Act, from April 6, 2007 through the date of his decision, and upheld the denial of DIB and SSI. R. 25.

The ALJ evaluated Claimant's application under the required five-step sequential evaluation process. R. 16. At step one, the ALJ found that Claimant has not engaged in substantial gainful activity since April 6, 2007, the alleged onset date. R. 17. At step two, the ALJ determined that Claimant has the severe impairments of seizure disorder and depression. *Id.* At step three, the ALJ found Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Pt. 404, Subpt. P, App. 1. R. 18-19. The ALJ determined that Claimant has the RFC to perform the full range of exertional activities and has the ability to understand, remember, and carry out instructions, respond appropriately to supervision and co-workers, and respond appropriately to work pressures in a work setting. R. 19-23. The ALJ found that Claimant should not be required to work around dangerous moving machinery and at unprotected heights. R. 19.

In assessing Claimant's credibility, the ALJ found that Claimant's allegations regarding the limiting effects and the severity of the symptoms of her impairments were only partially credible. R. 23. Further, the ALJ found that Claimant was not persuasive and that the objective evidence in the record did not support the extent of Claimant's alleged inability to perform work. *Id.* In making the RFC determination, the ALJ gave significant weight to state agency doctor Dr. Madala's opinion because it was consistent with the medical record available at the time of the assessment and not inconsistent with evidence added at the hearing level. *Id.* The ALJ also gave significant weight to state agency doctor Dr. Travis's

mental RFC because it adequately reflected Claimant's available medical record and it was consistent with applicable medical evidence added to the record at the hearing level. *Id.*

At step four, the ALJ found that Claimant was unable to perform any past relevant work. R. 24. Finally, at step five, the ALJ found that considering Claimant's age, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Claimant can perform. *Id.* Thus, the ALJ concluded that Claimant has not been under a disability, as defined in the Social Security Act, from April 6, 2007, the alleged onset date, through the date of the ALJ's decision. R. 25.

## II. LEGAL STANDARDS

### A.    Standard of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A decision by an ALJ becomes the Commission's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07, 120 S. Ct. 2080, 147 L. Ed. 2d 80 (2000). Under such circumstances, the district court reviews the decision of the ALJ. *Id.* The reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971). A "mere scintilla" of evidence is not enough. *Id.*; *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even when the record contains adequate

evidence to support the decision, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or an adequate discussion of the issues, it must be remanded. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010). Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports the findings. *Id.*

## B. Disability Standard

Disability insurance benefits are available to a claimant who can establish he is under a "disability" as defined by the Social Security Act. *Liskowitz v. Astrue*, 559 F.3d 736, 739-40 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability if he is unable to perform his previous work and cannot, considering his age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). Gainful

17

employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

A five-step sequential analysis is utilized in evaluating whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v). The ALJ must inquire, in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing other work. *Id.* Once the claimant has proven he cannot continue his past relevant work due to physical limitations, the ALJ must determine whether other jobs exist in the economy that the claimant can perform. *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008).

### III. DISCUSSION

### A. Substantial Evidence Supports the ALJ'S RFC Determination.

Claimant's briefs raised two issues for judicial review, arguing: "The ALJ's decision should be remanded because ALJ [sic] improperly relied on the Commissioner's Grid to deny disability despite the fact that Goffron's impairments result in significant nonexertional limitations. Moreover, the ALJ made an erroneous credibility determination."[2] Pl.'s Br. 1.[3]

_____

[2]Consistent with this opening language, the brief contained only two subsections in the "Argument" section: "A. The ALJ Committed Legal Error By Relying On The Grid" and "B. The ALJ's Credibility Finding is Legally Erroneous." Pl.'s Br. 11, 13. Plaintiff's Reply Brief did not raise any additional issues. Dkt. 26.

[3]"Pl.'s Br." refers to "Plaintiff's Brief in Support of Reversing or Remanding the Decision of the Commissioner." Dkt. 19.

18

At the oral argument, Claimant's counsel conceded that if the Court were to find that the RFC is supported by substantial evidence—a challenge to which was not raised in the briefs—it would be appropriate to affirm the ALJ's decision. Claimant's attorney proceeded to argue, for the first time, that the RFC determination does not adequately account for Claimant's mental impairments and, thus, is not supported by substantial evidence. Arguments not raised are waived. *See, e.g.*, *Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011) (explaining that arguments made for the first time in a reply brief are waived); *Pennington v. Astrue*, No. 09-973-JPG-CJP, 2011 U.S. Dist. LEXIS 36506 (S.D. Ill. Jan. 7, 2011) ("Arguments not raised are waived."). Thus, Claimant's argument that the RFC is not supported by substantial evidence is deemed waived.

Even if Claimant had properly raised a challenge to the RFC, the Court finds that the RFC was supported by substantial evidence. At step two the ALJ found that Claimant has the severe impairments of seizure disorder and depression and that those limitations "cause a significant limitation on the mental features of work activity along with workplace restrictions secondary to an underlying seizure disorder." R. 17. After finding that Claimant does not meet or equal a listed impairment, the ALJ moved on to determining Claimant's RFC.

The RFC is the maximum that a claimant can still do despite her mental and physical limitations. *Craft*, 539 F.3d at 676-77. The RFC is based upon the medical evidence in the record and other evidence, including the testimony of claimant and her family members. *Id.* at 677 (citing 20 C.F.R. § 404.1545(a)(3)). The ALJ must determine how much weight to

afford the opinions of doctors and must explain those decisions. *Id.* (citing 20 C.F.R. § 1527(d), (f)). When determining an RFC, the ALJ must consider all medically determinable impairments, physical and mental, even those not considered severe. *Id.* (citing 20 C.F.R. § 404.1545(a)(2), (b), (c)). Mental limitations are included in the RFC because a limited ability to complete activities, such as responding appropriately to supervisors, may reduce a claimant's ability to perform past work and other work. *Id.*

In the case at bar, the ALJ concluded: "After careful consideration of the entire record, I find that the claimant retains the ability to perform the full range of all exertional activities along with the ability to understand, remember, and carry out instructions, respond appropriately to supervision, and co-workers, and respond appropriately to work pressures in a work setting." R. 19. The ALJ limited Claimant to avoid working around dangerous moving machinery and at unprotected heights.

Substantial evidence exists in the record to support this determination. The ALJ reviewed Claimant's testimony and the medical evidence of record and concluded that the totality of the evidence regarding treatment of Claimant's bipolar disorder is slight, noting that the first documented treatment was in May 2004. R. 22. In addition, the ALJ found that the bulk of the evidence relating to the seizure disorder was dated well before the alleged onset date and noted that Claimant testified that her seizures are controlled with medication. R. 23, 37.

The record does not contain any opinion evidence from a treating source. Therefore, the ALJ gave significant weight to Dr. Madala's physical RFC and Dr. Travis's mental RFC

because they were consistent with other medical evidence. R. 23. Dr. Madala found that Claimant could perform work at all exertional levels, with the environmental limitations that the ALJ included. R. 491. Dr. Travis, in his summary conclusions, wrote that "[Claimant's mental status exam] is essentially normal except for appearing sad. She relates appropriately and is able to adapt to circumstances. She is able to learn instructions as she is cognitively intact and can function consistently as a reasonable rate within a schedule. She is able to do multistep tasks that can be learned within 1-6 months in a routine work setting." R. 487. Dr. Travis reached this conclusion after making specific reference to Dr. Gil's conclusions, R. 483, which Claimant relied on at the hearing. Dr. Gil's assessment found that Claimant exhibited moderate depression and that her last grand mal seizure was in 2004. R. 470. In limiting Claimant to unskilled work, the ALJ adequately addressed Claimant's impairments. In sum, the ALJ's RFC determination is supported by substantial evidence.

**B.      The ALJ Did Not Improperly Rely on the Medical-Vocational Guidelines. Rather, Substantial Evidence Supports the ALJ's Determination that Jobs Exist in Significant Numbers in the National Economy that Claimant Can Perform.**

Given that the RFC was supported by substantial evidence, even Claimant's attorney conceded at the hearing that the Court can affirm the ALJ's decision under existing Seventh Circuit precedent.  However, in her briefs Claimant argues that the ALJ improperly relied on the Medical-Vocational Guidelines ("the Grid") to find Claimant not disabled, despite the fact that Claimant's impairments result in significant nonexertional limitations.  Specifically, Claimant argues that it was legal error for the ALJ to rely solely on the Grid rather than obtain the testimony of a vocational expert ("VE") because the Grid does not account for nonexertional limitations.  The Court feels compelled to address this argument for the sake of completeness.

The ALJ found that Claimant can perform unskilled work. R. 19.  Because Claimant's past work was skilled, the ALJ found that Claimant can no longer perform that work.  R. 24. In determining Claimant's RFC, the ALJ made specific findings that Claimant retains the ability to perform "the full range of all exertional activities along with the ability to understand, remember, and carry out instructions, respond appropriately to supervision, and co-workers, and respond appropriately to work pressure in a work setting." *Id.*  An ability to perform these activities is the equivalent of an ability to perform unskilled work. *Craft*, 539 F.3d at 678 ("The Social Security Administration has stated that where the claimant has the ability to understand, carry out, and remember simple instructions; respond appropriately to supervision, coworkers, and usual works situations; and deal with changes in a routine

work setting, then a RFC of 'unskilled' work would be appropriate."); *see also* SSR 85-15, 1985 SSR LEXIS 20) ("The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.").

Where a claimant's impairments prevent her from performing past relevant work, the ALJ must determine whether a significant number of jobs exist in the national economy that a claimant can perform and the Commissioner's Grid comes into play. The Grid consists of a series of charts divided into categories of exertional work: sedentary, light, medium, heavy, and very heavy. 20 C.F.R. Part 404, Subpart P, App. 2, §§ 201.00-204.00. When applying the Grid, "the individual's residual functional capacity . . . age, education, and work experience must first be determined." *Id.* § 200.00(c). As Claimant has no exertional limitations, the ALJ appropriately referred to section 204.00 of the Grid: "If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking."[4] R. 24.

---

[4]Section 204.00 is the section of the Grid that applies to claimants who can perform heavy or very heavy work despite exertional impairments. 20 C.F.R. 404, Subpart P, App. 2, § 204.00. It reads: "The residual functional capacity to perform heavy work or very heavy work includes the functional capability for work at the lesser functional levels as well, and represents substantial work capability for jobs in the national economy at all skill and physical demand levels. Individuals who retain the functional capacity to perform heavy work (or very heavy work) ordinarily will not have a severe impairment or will be able to do their past work—either of which would have already provided a basis for a decision of 'not disabled'. Environmental restrictions ordinarily would not significantly affect the range of work existing in the national economy for individuals with the physical capability for heavy work (or very heavy work). Thus an impairment which does not preclude heavy work (or very heavy work) would not ordinarily be the primary reason for unemployment, and generally is sufficient for a finding of not disabled,

The ALJ, rather than relying solely on the Grid as Claimant asserts, then used the Grid as a framework while finding additional support in Social Security Rulings 82-36c, 83-10 and 85-15. *Id.* Particularly helpful to this Court is Social Security Regulation 85-15, titled "The Medical-Vocational Rules As A Framework For Evaluating Solely Nonexertional Impairments." SSR 85-15, 1985 SSR LEXIS 20. The purpose of SSR 85-15 is to emphasize that "the potential job base for mentally ill claimants without adverse vocational factors is not necessarily large even for individuals who have no other impairments, unless their remaining mental capacities are sufficient to meet the intellectual and emotional demands of at least unskilled, competitive, remunerative work on a sustained basis…." *Id.* at *1. More specifically, SSR 85-15 counsels:

> Where a person's only impairment is mental, is not of listing severity, but does prevent the person from meeting the mental demands of past relevant work and prevents the transferability of acquired work skills, the final consideration is whether the person can be expected to perform unskilled work…. Where there is no exertional impairment, unskilled jobs at all levels of exertion constitute the potential occupational base for persons who can meet the mental demands of unskilled work.

*Id.* at *11-12.

---

even though age, education, and skill level of prior work experience may be considered adverse." *Id.*

24

The ruling goes on to give the following example:

> Someone who is of advanced age, has a limited education, and did semiskilled work as a first-aid attendant no longer has the mental capacity to work [in emergency situations]. Although there may be very few related semiskilled occupations to which this person could transfer work skills, the large occupational base of unskilled work at all levels of exertion generally would justify a finding of not under a disability.

*Id.* at *14.

Similarly, Claimant is of advanced age, testified that she completed college, and can no longer perform her previous skilled work. She can, however, perform the full range of unskilled work at all levels of exertion, with two environmental limitations. Returning to the Grid, § 204.00 indicates that environmental limitations are unlikely to affect the range of work for someone without exertional limitations. 20 C.F.R. 404, Subpart P, App. 2, § 204.00. Thus, the ALJ did not exclusively rely on the Grid in reaching his decision that significant jobs exist that Claimant can perform.

Claimant cites a number of Seventh Circuit cases in which a claimant has both exertional and nonexertional limitations. The Seventh Circuit has held that where both exertional and nonexertional limitations exist the ALJ may not rely on the Grid to dictate a finding of disabled or not disabled; rather, an ALJ should consult a vocational source to determine whether nonexertional limitations change the conclusion suggested by the Grid. *Villano v. Astrue*, 556 F.3d 558, 564 (7th Cir. 2009) (holding that an ALJ could not rely on the Grid to find a claimant disabled where the claimant suffers from nonexertional limitations of pain and restriction from exposure to pulmonary irritants and hazardous machinery*)*; *Lawrence v. Astrue*, 337 Fed. App'x 579, 585 (7th Cir. 2009) (where a claimant's exertional

25

limitations restrict him to sedentary jobs, but his nonexertional limitations limit him to occasional reaching, the ALJ should consult vocational materials to determine if the nonexertional limitation is a significant burden on claimant's ability to perform sedentary jobs)*; Haynes v. Barnhart*, 416 F.3d 621, 629 (7th Cir. 2005) (holding that it is appropriate for an ALJ to consult with a vocational expert rather than rely exclusively on the Grid where a claimant, who suffered from physical limitations and numerous nonexertional limitations, did not fall squarely in either the sedentary or light work category); *Luna v. Shalala*, 22 F.3d 687, 691-92 (7th Cir. 1994) (rejecting the argument that a vocational expert was required where exertional limitations limited the claimant to sedentary work and the ALJ determined that his nonexertional impairments of pain and hand restrictions did not significantly impact his ability to perform the full range of sedentary work).

It is clear that where a claimant has both exertional and nonexertional limitations, an ALJ may not consider only exertional limitations, rely on the Grid, and ignore nonexertional limitations that are not accounted for. However, these cases do not dictate the remand of the case at bar where Claimant suffers from solely nonexertional limitations and the RFC, which is supported by substantial evidence, incorporates all nonexertional limitations to restrict Claimant to unskilled work at the full exertional range. Because Claimant does not have exertional limitations, in contrast to the claimants in the above Seventh Circuit cases, the ALJ appropriately referred to Section 204 of the Grid as a framework rather than blindly relying on other sections of the Grid to dictate a finding of not disabled.

In sum, after accepting the RFC, a vocational expert called would be asked one simple

question: Is there unskilled work that exists in the national economy, at any exertional level, that does not have to be performed at unprotected heights or around dangerous machinery? To remand the case and direct the ALJ to go through this exercise is neither required nor productive. *See, e.g.*, *Pawlowski v. Astrue*, No. 09 C. 6484, 2011 U.S. Dist. LEXIS 95317, at * 24-25 (Aug. 25, 2011) (noting that courts are not required to remand the decision of an administrative law judge unless the remand might lead to a different result). The case does not present the type of question that requires vocational expertise, as did the Seventh Circuit cases dealing with a combination of exertional and nonexertional limitations. The ALJ did not rely on the Grid to dictate a finding of not disabled while ignoring nonexertional limitations, as the Seventh Circuit has prohibited. Rather, the ALJ appropriately used the Grid as a framework, in combination with other guidance from relevant Social Security Rulings, to determine that a significant number of jobs exist in the national economy that Claimant can perform. The Court affirms the ALJ's determination.

Briefly, the Court feels compelled to address one other argument raised in the briefs. The Commissioner argues that the record evidence indicates that Claimant's seizure disorder is intertwined with alcohol abuse and that a finding of disabled is prohibited by legislation which precludes entitlement to disability benefits for claimants whose drug addiction or alcoholism is a "contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). First, the Court notes that the Commissioner cannot make arguments that the ALJ did not put forth in his opinion. *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) (citing *SEC v. Chenery Corp.*,

318 U.S. 80, 93-95 (1943)).  Further, while the ALJ noted that some medical records suggest a link between Claimant's seizure disorder and her history of alcoholism there is no indication that all of Claimant's impairments, particularly her bipolar disorder and depression, relate to her alcoholism in such a way that would make the alcoholism a material contributing factor.  None of the medical evidence conclusively established a direct causal link between Claimant's alcohol abuse and either her depression or seizure disorder.  The Court does not find that Claimant is precluded from being found disabled based on her history of alcoholism.

**C.    The ALJ Properly Evaluated the Credibility of Claimant's Testimony.**

Finally, Claimant  contends that the ALJ improperly evaluated the credibility of her testimony.  An ALJ's credibility determination is entitled to deference: "Because the 'ALJ is in the best position to determine the credibility of the witness,' the Court reviews that determination 'deferentially,' and will overturn a credibility determination 'only if it is patently wrong.'"  *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).  In determining whether a credibility determination is patently wrong, the Court examines whether the ALJ's determination was reasoned and supported.  *Jens v. Barnhart*, 347 F.3d 209, 213-14 (7th Cir. 2003).  The ALJ need only "minimally articulate his or her justification for rejecting or accepting specific evidence of disability."  *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004).  However, the ALJ may not ignore a claimant's statements regarding pain and other symptoms or disregard them merely because they are not substantiated by subjective medical evidence.  SSR 96-7p, 1996 SSR LEXIS 4, at *3.

28

In the case at bar, the ALJ found that "the claimant is not persuasive and what objective evidence is in the record does not support the extent of the claimant's alleged inability to perform work." R. 23. The ALJ continued: "In sum, I find that the claimant's allegations regarding limiting effects and the severity of the symptoms of her impairments are only partially credible." *Id.*

The sole fact that Claimant's allegations regarding her inability to perform work are not supported by objective medical evidence is not sufficient to discredit Claimant's testimony. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) ("The ALJ may not discredit a claimant's testimony about her . . . limitations solely because there is no objective medical evidence supporting it."). In addition, the ALJ is required to "articulate specific reasons for discounting a claimant's testimony as being less than credible, and [is precluded] from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a [less than credible] finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005).

In the present case, the ALJ does not rely solely on a lack of objective medical evidence. The ALJ notes specific inconsistencies and conflicts between Claimant's testimony and evidence presented at the hearing. First, Claimant testified at the hearing that she is unable to drive. R. 38. At the time of the hearing, however, Claimant held a valid driver's license with only eye restrictions. R. 38, 40. In addition, Claimant testified she experienced a grand mal seizure in May 2007. R. 38. However, the medical evidence did not support this claim. Claimant did not mention a grand mal seizure to her treating

physician or during her second consultative examination; additionally, one month earlier a treating physician observed her seizures were well controlled with medication.  R. 23.

The ALJ's finding that Claimant's allegations regarding the limiting effects and the severity of the symptoms of her impairments are only partially credible is adequately supported by the conflicts and inconsistencies in Claimant's testimony.  In light of the fact that the ALJ is in the best position to determine the credibility of the witness, and given these stated specific instances of inconsistencies in Claimant's testimony, this Court finds that the ALJ's credibility determination was reasonably supported and therefore was not "patently wrong."

## IV. CONCLUSION

For the reasons set forth in this opinion, the Court denies Claimant's complaint for judicial review seeking to reverse or remand the decision of the Commissioner and grants the Commissioner's motion to affirm the Commissioner's decision.

SO ORDERED THIS 2nd DAY OF MAY, 2012.

_Morton Denlow_

---

**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies sent to:**

Marcy E. Goldbloom
Daley, DeBofsky & Bryant
55 West Monroe Street, Suite 2440
Chicago, IL 60603

Eric S. Pruitt
Assistant United States Attorney
219 S. Dearborn St.
Chicago, IL 60604

Cynthia A. Freburg
Assistant Regional Counsel
200 West Adams Street
Suite 3000
Chicago, IL 60606

**Counsel for Plaintiff**

**Counsel for Defendant**